IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 4, 2003 Session

## JENNIFER DAWN WHITLEY v. RICHARD KEITH WHITLEY

Direct Appeal from the Chancery Court for Giles County
No. 2111     Stella Hargrove, Chancellor

No. M2003-00045-COA-R3-CV - Filed June 14, 2004

This is a divorce case involving the classification and division of property in a marriage of relatively short duration. Prior to marriage, the parties lived for a few months with the husband's parents before moving to a farm purchased by the husband with a down payment provided by his parents. The wife gave birth to the parties' child a few months after the move, and the parties subsequently married. Twenty-two months later, the wife filed for divorce. Both before and during the marriage, the wife assisted the husband with his cattle farming operation as well as with improvements to the property. The trial court found the farm to be marital property under the doctrine of transmutation, assigned it a value of $100,000, and awarded it to the husband. The trial court awarded most of the farm equipment and forty-eight head of cattle to the husband as his separate property and divided the marital property between the parties, with the husband awarded the remainder of the farm machinery and all but eleven head of cattle, and the wife awarded a 1987 Chevrolet Cavalier, the remaining cattle, and a cash judgment of $27,000 for her "substantial contributions to the farm and farming operation." The husband was assigned sole responsibility for the marital debt. The husband appeals, arguing that the trial court improperly classified, valued, and distributed the property. We conclude that the trial court correctly found that the farm was marital property, but erred in its valuation of the farm and in its distribution of the marital property. Accordingly, we modify the trial court's cash judgment to the wife to $11,886.50, which represents one-half of the equity in the farm at the time of the divorce and one-half of the unaccounted-for proceeds from the husband's sale of cattle in violation of an automatic injunction in the case.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as
Modified

ALAN E. GLENN, SP.J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Bobby W. Sands, Columbia, Tennessee, for the appellant, Richard Keith Whitley.

Timothy P. Underwood and Joe W. Henry, Jr., Pulaski, Tennessee, for the appellee, Jennifer Dawn Whitley.

# OPINION

## FACTS

In October 1997, Plaintiff/Appellee Jennifer Dawn Whitley ("Wife") moved in with Defendant/Appellant Richard Keith Whitley ("Husband") and his parents in their home in Culleoka. Husband was a cattle farmer and had acquired a substantial amount of farm machinery and livestock prior to meeting Wife. By contrast, Wife brought little personal property to the relationship. Wife became pregnant, and on May 26, 1998, Husband bought a 15.83-acre farm in Giles County for $82,000, where both parties moved in May prior to the September birth of their daughter, Codie. Husband paid $500 in earnest money and a down payment of $14,393, which he received as a gift from his parents, and financed the remainder of the purchase price with a $69,300 loan from Farm Credit Services, secured by a deed of trust on the property. The property and the deed of trust were in his name alone. Husband and Wife married on March 4, 2000.[1] During the parties' relationship, Husband earned extra income by hiring himself out to work and haul cattle for others. However, Husband's three most recent tax returns before the parties' divorce showed net losses, caused in part by the heavy debt he carried in association with his farming operation. Prior to and during the marriage, Wife assisted Husband with the cattle farming operation and, after the birth of their child, earned $15,000 per year as a part-time rural mail carrier.

On January 25, 2002, Wife filed for divorce, alleging inappropriate marital conduct on the part of Husband or, in the alternative, irreconcilable differences between the parties. Husband responded on April 17, 2002, with an answer and counter-complaint, denying Wife's allegations and alleging that Wife was guilty of inappropriate marital conduct. The parties thereafter agreed to have their case heard in an unusual trial format in which each party appeared with his or her counsel on July 9, 2002, to present evidence to the trial court in an informal setting where hearsay was allowed. There were no other witnesses and no cross-examination, as each party's testimony occurred out of the presence of the other and out of the presence of opposing counsel.

Wife, who testified first, said that Husband did not have the farm titled in her name because they "were not married at the time and he did not want [her] name on it." However, she had no doubt that Husband bought the farm in contemplation of their marriage, in order to provide a home for them and their child. She testified she and Husband searched for property together and that it was she who directed his attention to the farm, which appealed to her because the farmhouse reminded her of her grandparents' home. Wife said she and Husband bought livestock and farm equipment with the clear intention of jointly operating the farm as a married couple, but acknowledged Husband already had forty-four aged cattle and most of his farm equipment before they became a couple.

---

[1] Although Wife's complaint alleged that the parties married on March 3, she testified that the marriage took place on March 4.

Wife testified she played an active and ongoing role in the operation of the farm. In addition to developing and maintaining a recordkeeping system for the cattle, she raked and moved hay, wormed, tagged and dehorned cattle, castrated calves, and assisted with calving. When Husband worked either their own or the public's cattle, she assisted by readying pens, cleaning and disinfecting needles, gathering vaccinations, scheduling additional help if necessary, rounding up and moving the cattle to catch pens or hauling them by trailer back to their farm, and giving vaccinations. Additionally, she put out salt for the animals and, during Husband's recuperation from back surgery, mended fences that were broken by a neighbor's bull. Wife testified she also did all the housework in the home.

Wife testified she began earning approximately $15,000 per year as a rural mail carrier when Codie was a little over one year old. Husband insisted on separate bank accounts and used the money generated from their farming operation to pay the mortgage on the property, while she paid for daycare, utilities, food, clothing, and vacations with the money she earned from her job with the postal service. In addition, she used her money at various times to buy tags for Husband's truck, pay the farrier for shoeing Husband's horses, purchase corn and cattle, and pay $535 to the Giles County Trustee for the 1999 property taxes.

Wife testified Husband paid $82,000 for the property, but she believed he got a good price and that it was actually worth $100,000 at that time. She said she and Husband had dramatically improved the property and estimated it was currently worth $120,000. Wife testified they installed a metal beam in the stock barn to lift up the sagging loft, improved the catch pens by making them sturdier, installed a new fence around the perimeter of the property, dug out a pond, and added a roping pen arena. Their improvements to the farmhouse included laying new carpet throughout, redoing the kitchen walls and floor, replacing the wallpaper in Codie's bedroom, and adding a patio.

Wife's counsel informed the trial court that Husband had sold cattle on March 14, 2002, in violation of an automatic restraining order issued in the case. Among other exhibits submitted by Wife was her estimation of Husband's annual income, which reflected a total gross income of $74,230 for the sale of livestock and cattle work for the public, less total farm expenses of $29,732, for a net total annual income of $44,498.

Husband testified Wife began living with him at his parents' home on an intermittent basis around October 1997. However, they separated about the time she became pregnant and remained separated for four to six months, during which time Wife lived with a friend. He said he had been farming for a number of years and was actively looking for a farm to purchase for two to three years before his child's birth. When Wife became pregnant, he intensified his search because he "knew [he] had to have a place for [his] child to live." Husband testified he and Wife had no plans to marry at the time he bought the property, and his parents' gift of the down payment was consequently made to him alone. Wife later forced him into marriage by threatening not to give their child his name. In response to a question by the trial court, Husband conceded his child already had his name when he and Wife married, but nonetheless insisted Wife pressured him into marriage. He acknowledged

-3-

Wife accompanied him to look at the property and that she and her parents were present at the closing.

Husband testified the $82,000 purchase price was the property's approximate fair market value and introduced the Farm Credit Bureau real estate valuation report, prepared at the time of purchase, which reflected an appraisal of $82,752, as well as the county tax card, on which the appraised value of the land and improvements was listed as $58,154. He testified local land prices had not risen because the farm economy was in "shambles" and the Saturn automobile manufacturing plant had "fizzled out." Therefore, in his opinion, the property's present value was approximately the same as the appraised value at the time of purchase. In contrast to Wife's testimony, Husband said he had made only a few, relatively minor improvements to the property. He said he cleaned the barns and replaced a few boards but used material on hand and did not spend any money. Wife was pregnant at that time and did nothing to help. He also repaired and replaced a few fences. As for the house, his parents gave him new linoleum for the kitchen floor, and they "touched up some paint and little odd and end stuff." Although Wife helped "somewhat," most of the work was done by his grandmother, mother, aunt, and sister.

Husband testified Wife occasionally helped with the cattle farming by keeping unnecessary records and helping to work cattle or rake hay, but she was afraid of cows and was not involved on a day-to-day basis. Wife disliked the sight of blood and never dehorned cattle or castrated calves. Husband testified he was able to run only two or three calves on his property, which was hill land, and therefore leased additional farms on which to run the remainder of his cattle and grow hay. He described himself as a "one-man operation" and stated that his father and a friend helped out during his recuperation from back surgery. Wife was not an early riser and participated in the work only when she felt like doing so. Husband testified his income came from his farming operation as well as from working and hauling cattle for the public. He said he was paid in cash for the cattle work he performed for others and did not usually report that income.

Husband testified he owned numerous head of cattle at the time he met Wife, as well as all of his farm equipment with the exception of a trailer, a front-end loader, and a two-ton truck. Wife owned a Ford Ranger pickup truck, which was repossessed before their marriage, and several odds and ends of furniture and household furnishings without any real value. Wife had a poor credit history, could not manage money, and spent her salary from her part-time job on clothes, books, photographs, and eating out, as she disliked cooking. Husband acknowledged Wife paid some bills from her checking account but maintained she never paid a house note, property insurance premium, or the land taxes with her money. He explained he had no checking account when they met, and therefore reimbursed Wife with cash for the checks she wrote to pay bills. Husband said Wife wanted her name on the deed to the farm, but he refused. Wife also wanted her name on some heifers he purchased, but, because of her poor credit history, the loan would not be approved with her name on it.

Husband introduced appraisals of his cattle and farm equipment. He testified everything he owned, with the exception of a head chute, hay unroller, and wrecked two-ton truck, was subject to

a lien. According to Husband's testimony and the records he introduced, he had a $69,300 mortgage on the property with an estimated payoff as of July 8, 2002, of $63,477.18; a $4,100 loan for a front-end loader; an operating loan from Farm Service Agency with a current balance of $62,097.91; and a cattle loan from Farm Service Agency with a current balance of $39,894.79. Husband testified he had used the proceeds from a recent sale of cattle made in violation of the injunction to pay his land taxes and house note and was presently in a "squabble" with Farm Service Agency because he had not realized that the offspring of his cattle were subject to the financing statement.

At the conclusion of the proceeding, the trial court declared the parties divorced pursuant to section 36-4-129(b) of the Tennessee Code.[2] On July 22, 2002, the trial court issued detailed findings of fact and conclusions of law, which it later incorporated into a September 6, 2002, final order. Among other things, the trial court found that the farm had been converted into marital property under the doctrine of transmutation and was subject to equitable division, assigning it a value of $100,000, with Husband given no credit for the earnest money or down payment. The trial court awarded Husband forty-eight head of cattle and most of the farm equipment, with a total value of $71,300, as his separate property; awarded Husband sixty-seven head of cattle, the proceeds from the sale of cattle, the front-end loader, head chute, a rope saddle, and the house and acreage, with a total value of $160,648, as his share of the marital estate; and awarded Wife eleven head of cattle, a 1987 Chevrolet Cavalier, and $27,000 in cash, with a total value of $29,500, as her share of the marital estate. Husband was assigned sole responsibility for the debt, which totaled $174,982. The trial court summarized the above division of property as follows:

SUMMARY:

| | |
|---|---|
| Total value of marital estate before debt | $ 163,148.00 |
| Husband will receive | $ 160,648.00 |
| Husband's separate property | $ 71,300.00 |
| TOTAL TO HUSBAND | $ 231,948.00 |
| Less Debt | -174,982.00 |
| NET TOTAL | $ 56,966.00 |
| Less Cash to Wife | -27,000.00 |
| ADJUSTED NET TOTAL | $ 29,966.00 |
| Total value of marital estate to Wife | $ 2,500.00 |
| Cash distribution | 27,000.00 |

---

[2]Tennessee Code Annotated section 34-4-129(b) provides that "[t]he court may, upon stipulation to or proof of any ground for divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone."

TOTAL ESTATE TO WIFE.                                    $ 29,500.00

> With this distribution, Husband keeps all cattle that he says are his, all farm machinery and equipment, and the real property. His debt is increased by $27,000.00. Wife recovers her 6 cows/5 calves and her 1987 Cavalier. She receives $27,000.00 for her substantial contributions to the farm and farming operation. Wife will have a judgment for $27,000.00. Interest will accrue at the rate of 10% per annum, beginning 30 days from the date of entry of the Final Judgment.

From this order, Husband now appeals.

## ANALYSIS

Husband raises four issues on appeal: (1) whether the trial court erred in classifying the house and sixteen acres as marital property; (2) whether the trial court's valuation of the house and sixteen acres is supported by the evidence; (3) whether the trial court erred in the application of the law regarding Wife's substantial contribution, or, in the alternative, whether the $27,000 awarded to Wife for her substantial contribution is speculative; and (4) whether the trial court's distribution of marital property is inequitable given the short duration of the marriage.

Since this case was heard by the trial court sitting without a jury, our standard of review is governed by Tennessee Rule of Appellate Procedure 13(d), which provides for a *de novo* review upon the record with a presumption of correctness given to the trial court's findings of fact. Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. Tenn. R. App. P. 13(d). We review questions of law *de novo*, with no presumption of correctness. Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 367 (Tenn. 1998).

We necessarily begin our analysis of the issues presented in this case with a review of the applicable law regarding the classification and division of property in a divorce. Because Tennessee is a dual property state, the trial court must first classify the property in a divorce as either separate or marital. Tenn. Code Ann. § 36-4-121 (Supp. 2002); Batson v. Batson, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). The trial court is vested with wide discretion in its classification of property, and its decision in that regard is given great weight on appeal. Dunlap v. Dunlap, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998) (citations omitted). A similar weight is given to the trial court's division of the property it has classified as marital. Dellinger v. Dellinger, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997) (citations omitted); Ford v. Ford, 952 S.W.2d 824, 825 (Tenn. Ct. App. 1996). The trial court's classification and division of property is a finding of fact, which is presumed to be correct unless the evidence preponderates against it. Tenn. R. App. P. 13(d); Dunlap, 996 S.W.2d at 814; Dellinger, 958 S.W.2d at 780.

Separate property is defined as "[a]ll real and personal property owned by a spouse before marriage," and "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(A), (D) (Supp. 2002). Marital property is defined, *inter alia*, as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of the filing of a complaint for divorce[.]" Tenn. Code Ann. § 36-4-121(b)(1)(A) (Supp. 2002).

Husband first contends that the trial court erred by classifying the house and acreage as marital property. In support of this argument, he cites the fact that the farm was bought before marriage, titled in his name alone, and purchased with his separate funds, namely, the money he received from his parents for the down payment. Husband also points out that the parties' marriage was of short duration and that he was solely responsible for the debt on the property. He argues that the preponderance of the evidence shows that he intended the farm to remain his separate property, and that the trial court therefore erred in determining that it converted to marital property under the doctrine of transmutation. Husband asserts that, at a minimum, he should have been credited with the down payment and earnest money he paid toward the farm's purchase.

Under the doctrine of transmutation, separate property may become the property of the marital estate if there is evidence that the parties intended for it to be marital property and treated it as such. Langschmidt v. Langschmidt, 81 S.W.3d 741, 747 (Tenn. 2002). Treating the property in such a way creates a rebuttable presumption of a gift to the marital estate, which can be overcome by "'evidence of circumstances or communications clearly indicating an intent that the property remain separate.'" Id. (quoting 2 Homer H. Clark, The Law of Domestic Relations in the United States § 16.2 at 185 (2d ed. 1987)).

It was undisputed that Husband purchased the farm prior to the parties' marriage with a down payment provided by his parents as a gift, that it was titled in his name alone, and that he was the sole party responsible for the debt on the property. However, it was also undisputed that the parties were living together at the time of the purchase and that Wife was pregnant with their child. Wife unequivocally testified that Husband bought the farm in contemplation of the parties' marriage and to provide a home for them and their child. According to her testimony, she and Husband searched for property together and she encouraged and approved of the purchase because the farmhouse on the property reminded her of her grandparents' home. Wife presented evidence that she paid the 1999 tax bill on the property, and testified that the parties paid their living expenses with the income she earned from her postal service job, while Husband used the income they received from their cattle farming operation to pay the mortgage. Wife additionally testified that she worked with Husband to improve the property by refurbishing barns and catch pens, erecting new fences, and partially renovating the house.

Husband, by contrast, testified that the down payment was a gift to him alone, that he never intended for the farm to become part of the marital estate, and that Wife provided only minimal assistance with the few slight improvements made to the property. However, Husband conceded

Wife accompanied him in his search for property, went with him to look at the farm before purchase, and was present at the closing. Additionally, although he denied that he and Wife were planning to marry at the time, Husband testified that he bought the property because he knew he had to have a home for his child. With respect to this issue, the trial court found:

> The doctrine of transmutation: An integral part of this doctrine is the intent of the parties. The property was placed solely in the name of Husband. The Court finds ample evidence to support the presumption that Husband intended the property to be a gift to the marital estate. The parties were cohabitating at the time of purchase. They looked for a house together. The Court is convinced that they jointly decided to purchase this particular house and property. This was a joint enterprise. Husband says that Wife's credit was bad. It makes sense to the Court that financing would most likely be facilitated by putting the property in Husband's name alone.

Implicit in the above finding is the trial court's accreditation of Wife's testimony over that of Husband's. The trial court is in the best position to determine the credibility of the parties, and we accord its determinations on the credibility of witnesses great weight on appeal. See Tenn-Tex Properties v. Brownell-Electro, Inc., 778 S.W.2d 423, 426 (Tenn. 1989); Barnhill v. Barnhill, 826 S.W.2d 443, 448 (Tenn. Ct. App. 1991). Giving due deference to the trial court's credibility determinations, we conclude that the evidence preponderates in favor of the trial court's finding that Husband intended the house and acreage to be a gift to the marital estate. We also find no error in the trial court's not giving Husband credit for the down payment and earnest money he paid toward the property's purchase. Accordingly, we affirm the trial court's classification of the farm, including the down payment and earnest money applied towards its purchase, as marital property.

Husband next argues that the trial court erred in its valuation of the farm. He contends that he supported his $82,752 valuation of the property with the deed showing the purchase price, the appraisal performed at the time of purchase, and the appraised value on the Giles County tax card, while Wife presented very little credible evidence in support of her $120,000 valuation. Wife responds by arguing that the trial court appropriately assigned a value within the range of values presented at trial.

When faced with conflicting evidence, a trial court may place a value on property that falls within the range of competent proof presented. See Watters v. Watters, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997) (citations omitted); Wallace v. Wallace, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). "The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present." Id. Evidence of the farm's current fair market value came solely from the testimony of the parties, as neither Husband nor Wife offered a current appraisal or expert testimony. In Tennessee, the owner of real property is generally considered to be qualified by reason of ownership alone to give an opinion regarding the value of his or her property. See Tenn. R. Evid.

701; <u>Airline Constr., Inc. v. Barr</u>, 807 S.W.2d 247, 254-55 (Tenn. Ct. App. 1990). Thus, Husband, as the title owner, was qualified to give his opinion as to the property's current fair market value.

At oral argument, Wife's counsel asserted that Wife was similarly qualified to offer her lay opinion on the property's value by virtue of the doctrine of transmutation, which converted her into an owner of the property with Husband. Although counsel offered no case law in support of this position, we note that the Tennessee Court of Criminal Appeals allowed a husband in a theft of property case to offer his lay opinion testimony on the value of a vehicle titled in his wife's name, notwithstanding the general prohibition against a lay witness other than the title owner offering testimony on the value of property, when there was evidence that the vehicle was joint marital property and the husband's valuation was "clearly arrived at through intimate knowledge of the vehicle." <u>State v. Holt</u>, 965 S.W.2d 496, 498 (Tenn. Crim. App. 1997). However, even assuming, *arguendo*, that Wife was qualified by virtue of her "joint ownership" to testify as to the farm's current value, we conclude that her testimony was entitled to little weight. Unlike Husband, who supported his valuation with the real estate appraisal performed at the time of purchase, the assessed value of the property on the county tax card, and testimony about the condition of the farming economy and the area's automobile manufacturing plant, Wife offered little in support of her valuation other than her own opinion. As the <u>Barr</u> court stated:

> Although an "owner" of real property is deemed to have special knowledge about his property to offer an opinion as to its value, the owner's opinion will be given little weight when founded upon pure speculation. There must be some evidence, apart from mere ownership, that this "value" is a product of reasoned analysis. This reasoning is consistent with the United States Claims Court as set forth in <u>Snow Bank Enterprises, Inc. v. United States</u>, in which it stated an owner's opinion as to the value of his property "must be founded upon evidence in the record, rather than upon conjecture, speculation or unwarranted assumptions." 6 Cl. Ct. 476 (1984), citing <u>United States v. Sowards</u>, 370 F.2d 87, 92 (10th Cir. 1966).

807 S.W.2d at 256. Because Wife failed to offer any evidence to show that her valuation was the product of "reasoned analysis," the only competent proof on valuation in the record was Husband's testimony that the current fair market value was approximately the same as the appraised value at the time of the property's purchase. We, therefore, conclude that the trial court erred in assigning a value of $100,000 to the farm rather than the $82,752 value offered by Husband's testimony. Accordingly, we reverse the trial court on this issue.

As his third issue, Husband contends that the trial court misapplied the doctrine of substantial contribution or, in the alternative, that its award of $27,000 to Wife for her substantial contribution to Husband's farming operation is speculative. Tennessee Code Annotated section 36-4-121 provides that marital property "includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party

substantially contributed to its preservation and appreciation[.]" Tenn. Code Ann. § 36-4-121(b)(1)(B) (Supp. 2002). "[S]ubstantial contribution" includes, but is not limited to, "the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine." Id. § 36-4-121(b)(1)(D) (Supp. 2002).

Husband argues that the trial court could not have determined that Wife was entitled to an award for any income from or appreciation of the farming operation without first determining that the farming operation was Husband's separate property, which it failed to do. Husband further argues that the trial court's award was speculative because Wife offered no proof of the value of the farming operation prior to marriage or of its increase in value during marriage. Wife argues that the trial court made no distinction between the "farming operation" and the farm itself. She asserts that the trial court "obviously" accepted her theory of an implied partnership and awarded her $27,000 for her investment of "time, labor and energy into producing a profitable and productive enterprise."

We believe that both Husband and Wife have misinterpreted the trial court's findings. There is nothing in the record to indicate that the trial court accepted Wife's argument of an implied partnership, or that the farm was a "profitable and productive enterprise." Furthermore, a close reading of the trial court's order does not support Husband's contention that the cash judgment to Wife was intended as compensation for her substantial contribution to the farming operation as a separate business entity, apart from the land, farmhouse, and livestock. The trial court first referred to Wife's "substantial contribution" in a section of its order entitled "The marital residence and farming operation." After detailing Wife's testimony with respect to her total contributions during the time the parties lived together, including the assistance she provided with the farming operation, improvements to the land and house, and payment of living expenses out of her separate income, the trial court wrote:

> While Wife is probably exaggerating her role in the cattle operation, the Court does find substantial contribution on her part. The Court finds that Husband is unfairly downplaying Wife's role in the acquisition, clean-up and upkeep of the farm, as well as her role in the daily operation of the farm and her contribution to the work done for the public.

The trial court then considered the applicable factors under Tennessee Code Annotated section 36-4-121 for the equitable division of marital property, including factor (5), which states:

> The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role[.]

With respect to this factor, the trial court specifically found "substantial contributions on the part of each party."

Thereafter, the trial court divided the marital property, awarding Husband the house and acreage, all but eleven head of cattle, the head chute, the front-end loader, a roping saddle, and $4,498, which represented the "proceeds from cattle check of $27,323.00 not sufficiently accounted for," and awarding Wife a 1987 Chevrolet Cavalier, eleven head of cattle, and a cash distribution of $27,000. Thus, although the trial court referred in its summary to the $27,000 Wife received for her "substantial contributions to the farm and farming operation," it appears that the cash distribution represented a portion of Wife's division of the entire marital estate, rather than payment for her contribution to any income or appreciation in value of Husband's separate farming operation. We conclude, therefore, that the trial court did not misapply the doctrine of substantial contribution.

As his final issue, Husband contends that the trial court's distribution of the marital estate is inequitable given the short duration of the marriage and the fact that Wife brought no property of any value to the relationship. Husband cites Batson v. Batson, 769 S.W.2d 849, 860 (Tenn. Ct. App. 1988), for the proposition that in a marriage of short duration it is appropriate to divide the property in a way that places the parties in the same position they would have occupied had the marriage never taken place, and asserts that, under the circumstances, the $27,000 cash distribution to Wife amounts to a windfall. Wife argues that the trial court's division of the property was equitable given the value of Husband's separate property, her substantial contributions to the marital estate, the trial court's award of the marital home to Husband, and the fact that she was awarded primary custody of the parties' child, which will require her to relocate with the child to another home.

A trial court's equitable division of marital property is governed by Tennessee Code Annotated section 36-4-121(c) (Supp. 2002), which provides that a trial court shall consider all relevant factors, including the following:

> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
>
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
>
> (4) The relative ability of each party for future acquisitions of capital assets and income;
>
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as

homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6)     The value of the separate property of each party;

(7)     The estate of each party at the time of the marriage;

(8)     The economic circumstances of each party at the time the division of property is to become effective;

(9)     The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)   The amount of social security benefits available to each spouse; and

(11)   Such other factors as are necessary to consider the equities between the parties.

In light of the above factors, each case involving the division of marital property must be determined under its own unique set of facts and circumstances. See Wade v. Wade, 897 S.W.2d 702, 717 (Tenn. Ct. App. 1994). There is no presumption that marital assets should be divided equally, and an equitable division, therefore, need not be an equal division. See Bookout v. Bookout, 954 S.W.2d 730, 731 (Tenn. Ct. App. 1997). Rather, the trial court's goal should be to divide the assets in a fair and equitable manner. See Fulbright v. Fulbright, 64 S.W.3d 359, 366 (Tenn. Ct. App. 2001).

The trial court made the following findings with respect to the division of marital property:

Distribution of the marital estate: The Court has considered all applicable factors of Tenn. Code Ann. 36-4-121, including:

The duration of the marriage: This is a very short marriage. There is a presumption that the parties should be restored to their original positions prior to marriage.

The age, physical and mental health, vocational skills, employability, earning capacity, estate and financial needs of the parties: Neither party complains of any ill health. While Husband traditionally shows a farm loss on paper, he has a proven record of good credit and is able to make a decent living in a very difficult

occupation. Obviously, he is in demand by the public, for roping cattle and in tending to hay on some six farms. The Court accepts Wife's proposal of Husband's estimated annual income reflected by Exhibit 1. At the present time, Wife is employed part time by the postal service, at a net monthly salary of $1060.00. Under the Court's distribution she will have to relocate and start a new home for herself and Codie.

The relative ability of each party for future acquisitions of capital assets and income.

The value of the separate property of the parties.

The contributions of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital property, including the contribution of a party to the marriage as a homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role: The Court finds substantial contributions on the part of each party.

The economic circumstances of each party at the time the division of property is to become effective.

We conclude that the evidence preponderates against the trial court's division of the marital property. In addition to erroneously valuing the farm at $100,000, the trial court also included the value of Husband's separate property in its computation and division of the marital estate, apparently using the total value of Husband's separate and marital property, minus the debt, to arrive at the cash distribution required to place Wife's total estate on an equal level with Husband's total estate.[3] Although it is appropriate for a trial court to consider the value of a party's separate property in its division of the marital estate, see Tenn. Code. Ann. § 36-4-121(c)(6) (Supp. 2002), we find the manner in which the trial court included the total value of Husband's separate property in its computation and division of the marital property to be error in this case. Husband's separate property was not part of the marital estate and, therefore, was not subject to division. See Smith v. Smith, 93 S.W.3d 871, 876 (Tenn. Ct. App. 2002); Cutsinger v. Cutsinger, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995).

As Husband points out and the trial court noted, in a marriage of relatively short duration, there is a presumption that the parties should be returned, as nearly as possible, to the positions they

---

[3] By the trial court's calculations, Husband's separate and marital property, minus debt, totaled $56,966. Wife's portion of the marital property totaled $2,500. Subtracting $2,500 from $56,966 leaves $54,466, of which one-half equals $27,233, the approximate amount of the cash judgment awarded to Wife.

would have occupied had the marriage never taken place. <u>Batson</u>, 769 S.W.2d at 860. Here, the parties were married for only twenty-two months. Wife, in contrast to Husband, brought little in the way of material possessions to the relationship. Wife testified that she assisted Husband with his farming operation, his cattle work performed for the public, and improvements to the property, and that the parties used her postal service salary to pay many of their living expenses. However, she also testified that Husband used the money generated from the farming operation to pay the mortgage on the property. Husband essentially corroborated Wife's testimony with respect to the farming income, testifying that the money from the cattle operation went back into the farm, and that he had used the proceeds from the recent sale of cattle to pay the mortgage and land taxes. Under these circumstances, and keeping in mind that Wife's income is less than Husband's and that she will be required to relocate with the parties' child, we believe that an equitable division of the marital property can be achieved by Husband's retaining the farm, farm machinery, and cattle, along with the attendant debt and other miscellaneous items that he was awarded by the trial court; Wife's retaining the cattle, automobile, and other miscellaneous items that she was awarded; and Wife's receiving a cash judgment in the amount of $11,886.50, which represents one-half of the equity in the farm and one-half of the unaccounted for proceeds from Husband's March 2002 sale of cattle.[4] Accordingly, we modify the cash judgment to Wife from $27,000 to $11,886.50. In all other respects, the trial court's division of the marital property is affirmed.

## CONCLUSION

The judgment of the trial court is affirmed as modified in accordance with this opinion. Costs on appeal are taxed equally between Husband and Wife, for which execution may issue, if necessary.

ALAN E. GLENN, SPECIAL JUDGE

---

[4] To arrive at the equity in the farm, we have subtracted $63,477, the amount that Husband testified was the payoff on the mortgage at the time of the divorce proceedings, from the $82,752 valuation Husband placed on the farm. The proceeds from the sale of cattle which remained unaccounted for totaled $4,498.